IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

HENRY LEE PARROTT, et al.,    )
    )
    Plaintiffs,    )
    )    NO. 3:23-cv-00618
v.    )
    )    JUDGE RICHARDSON
APRIL ODOM, et al.,    )
    )
    Defendants.    )
    )

## MEMORANDUM OPINION

Plaintiffs, Henry Lee Parrott ("Plaintiff Parrott") and Estate & Financial Strategies, Inc. ("Plaintiff EFS" or "EFS"), initiated this lawsuit on June 16, 2023 by filing a complaint (Doc. No. 1, "Complaint"), in this Court naming as Defendants April Odom ("Defendant Odom") and Elizabeth Bowling ("Defendant Bowling"). Plaintiffs filed an amended complaint (Doc. No. 5, "Amended Complaint") on July 13, 2023, which likewise named (only) Defendant Odom and Defendant Bowling as Defendants.[1]

Now pending before the Court is the "Motion to Dismiss [the Amended Complaint]" (Doc. No. 21, "Motion") filed by Defendants and supported by a memorandum (Doc. No. 22, "Opening Brief"). Plaintiffs have filed a response (Doc. No. 26, "Response") in opposition to the Motion, and Defendants have filed a reply (Doc. No. 28, "Reply"), in further support of the Motion.

For the reasons described herein, the Court will **GRANT** the Motion in its entirety.

---

[1] Defendant Odom and Defendant Bowling are sued only in their individual capacities.

1. The Parties[3]

Plaintiff EFS is "a Tennessee corporation . . . that provided clients with comprehensive retirement and financial planning services." (Doc. No. 5 at ¶ 7). "From 2004 until December 31, 2021," Plaintiff EFS "was registered as an investment advisor in Tennessee." (*Id.* at ¶ 8). "As a registered investment advisor ("RIA")," Plaintiff EFS had "been subject to multiple routine books and records examinations by the Tennessee Securities Division (the "Division")," which resulted in "no prior reported violations or uncorrected deficiencies." (*Id.* at ¶ 9).

Plaintiff Parrott is a resident of Tennessee and is the "sole owner of EFS." (*Id.* at ¶ 10). Until December 31, 2021, Plaintiff Parrott "was registered in Tennessee as an investment advisor representative ("IAR") with EFS." (*Id.*).

Defendant Odom is the "Director of Registration for the Tennessee Department of Commerce and Insurance" at the Division. (*Id.* at 1). Defendant Bowling is the "Assistant Commissioner for the Tennessee Department of Commerce and Insurance," at the Division. (*Id.*).

---

[2] The facts herein are taken from the Amended Complaint. For purposes of the instant Motion, the facts in the Amended Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

   The Court quotes extensively from the Amended Complaint herein. For clarity, the Court notes that unless indicated otherwise, as for example, by the use of single quotation marks nested within a portion of the Amended Complaint quoted using double quotation marks, it is quoting the Amended Complaint and not directly quoting some statement (made during the underlying alleged events at issue) that the Amended Complaint quoted or paraphrased.

[3] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Amended Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

Although not a party to this action, the "Division is the regulatory agency charged with, among other things, overseeing RIAs and IARs in Tennessee."[4] (*Id.* at ¶ 12). "In such capacity, the Division conducts routine books and records examinations of RIA firms, which are typically conducted on a three-year cycle." (*Id.*).

2. <u>Factual Background</u>

This case arises out of the renewal, or rather the non-renewal, of Plaintiff EFS's and Plaintiff Parrott's respective "RIA and IAR registrations," in January 2022. (*Id.* at ¶ 29).

The circumstances leading to this case began on November 13, 2020, when the Division "opened a routine books and records examination of EFS [("Examination")]. The [E]xamination was assigned to Securities Examiner Devlyn Simon ("Simon")." (*Id.* at ¶ 13). Plaintiff Parrott cooperated with the Division's Examination and "timely provided all requested documentations, corrected potential issues noted by the Division, and answered all inquiries posed by the examiner," Simon. (*Id.* at ¶ 14). After Simon conducted an initial interview with Plaintiff Parrott in November 2020, "no one from the Division contacted [Plaintiff] Parrott to discuss the examination or any of the requested documents." (*Id.* at ¶ 15). On January 13, 2021, Simon sent Plaintiffs "a follow-up request for additional documents and information ("First Deficiency Letter")," to which Plaintiffs responded with "the requested documents and information on February 12, 2021." (*Id.* at ¶ 16). On May 17, 2021, Simon sent Plaintiffs a request for additional information (the "Second Deficiency Letter"), in response to which Plaintiffs provided the "requested documents and information on June 1, 2021" and provided "a supplemental response on July 9, 2021." (*Id.* at ¶ 17). In June 2021, the Division paused the Examination, and "the

---

[4] The Amended Complaint implies, albeit without expressly stating, that the Division is a part (a "division," unsurprisingly) of the Tennessee Department of Commerce and Insurance. The Court takes judicial notice that this is in fact the case.

Division had no further communication with Plaintiffs from May 17, 2021 to December 20, 2021." (*Id.*).

On December 22, 2021, following communications between Simon and Plaintiff Parrott, "the Division requested additional information, and gave Parrott a deadline of January 7, 2022 to provide the requested materials." (*Id.* at ¶ 20). Plaintiffs "provided an initial response to the Division's December 22 request by the deadline and a supplemental response on January 10, 2022." (*Id.* at ¶ 22).

On January 12, 2022, at the conclusion of the Examination, Simon produced a "findings letter" that "outlin[ed] alleged deficiencies found pursuant to the [Examination]. . . (the "Findings Letter")." (*Id.* at ¶¶ 23-24).[5] A call to discuss the findings was scheduled for the next day, January 13, 2022, "by and among Simon, Defendant Odom, Plaintiff Parrott, and "Craig Watanabe, Director of IA Compliance at RIA Compliance Firm LLC." (*Id.* at ¶ 27). On the January 13 call, Plaintiffs were made aware "of several alleged 'books and records' deficiencies, and were again told that they would likely receive a warning letter or a small fine and be required to address any deficiencies." (*Id.* at ¶ 28).

Plaintiff EFS and Plaintiff Parrott are "required to renew their RIA and IAR registrations," respectively, every year. (*Id.* at ¶ 29).[6] In order to renew, "RIA registrants"—and inferably also IAR registrants, although the Amended Complaint does not here mention IAR registrants—"have to file annual amendments and pay a nominal renewal fee. If everything is complete and the fees

---

[5] A "findings letter" is a document "produced at the conclusion of [an] examination and outlines alleged deficiencies and corrective measures that may need to be taken." (*Id.* at ¶ 23). The Court uses the term "findings" to discuss the content of such a letter, including the Findings Letter in particular.

[6] Although not explicitly explained in the Amended Complaint, the Court understands that these registrations permit Plaintiff EFS and Plaintiff Parrott to conduct business as an RIA and IAR, respectively.

are paid, the renewal in Tennessee is automatic." (*Id.* at ¶ 30).[7] "FINRA established the "E-Bill"

system that enables RIAs" (meaning, the Court infers, RIA *registrants*)—and again, inferably, also

IARs (meaning, the Court also infers, IAR *registrants*)—"to authorize electronic payment directly

from a designated bank account to pay annual renewal registration fees." (*Id.* at ¶ 31).

"Plaintiffs' renewal fees were set up to pay each year through the [above described] E-Bill

system." (*Id.* at ¶ 32). However, on "December 31, 2021," Plaintiffs' "renewal registrations failed

to renew simply because [Plaintiffs] were unaware that there were insufficient funds in EFS' E-

Bill account." (*Id.* at ¶ 34). Plaintiffs allege that "[b]ut for the fact that the FINRA E-Bill account

was underfunded, Plaintiffs were otherwise qualified for renewal and should have automatically

been renewed on January 1, 2022." (*Id.* at ¶ 35). The Division was made aware of Plaintiffs'

---

[7] The renewal process detailed above is governed by certain provisions in Tenn. Code Ann. §§ 48-1-101–48-1-201. Provisions in two sections in particular—§ 48-1-110 and § 48-1-112—are relevant to this case in that they provide procedures for the Commissioner of the Tennessee Department of Commerce governing its consideration of whether to deny an application for a registration or suspend or revoke an existing registration for an RIA and IAR.

Tenn. Code Ann. § 48-1-110(a)(1-3) prescribes certain *procedural* requirements (regarding what is to be included in the actual application and the completion of a criminal background check) that applicants for RIA and IAR registrations must satisfy when applying for said registrations.

Tenn. Code Ann. § 48-1-110(a)(4) then provides, with respect to applications for RIA and IAR registration, that if "no denial order is in effect and no proceeding is pending under § 48-1-112, such registration becomes effective at twelve o'clock (12:00) noon, central time, of the thirtieth day after a completed application is filed. The commissioner may by rule or order specify an earlier effective date, and may by order defer the effective date until twelve o'clock (12:00) noon, central time, of the thirtieth day after the filing of any amendment."

Tenn. Code Ann. § 48-1-112(a) provides that "[t]he commissioner may by order deny, suspend, or revoke any registrations under this part if the commissioner finds that" (1) "The order is in the public interest and necessary for the protection of investors; and (2) "the applicant or registrant" has engaged in certain conduct provided for in Tenn. Code Ann. § 48-1-112(a)(2)(A-K).

The upshot of these provisions taken together is that a registration may be suspended or revoked, and an complete *application* for a registration— either in the form of an application for a new registration or in the form of an application for renewal of an existing registration, both of which the Court notes are materially different from an extant registration with respect to finding a property interest implicating due process protections—may be denied only for cause, meaning that the commissioner must find that the suspension, revocation, or denial is in the public interest and that the circumstances implicate particular statutory provisions apply; otherwise state officials lack discretion to deny issuance or renewal of a registration.

"oversight on January 4, 2022, when Senior Securities Examiner Patterson [("Patterson")] ran a 'failure to renew' ("FTR") report, which clearly indicated that EFS failed to renew." (*Id.* at ¶ 37). The Division notified Plaintiffs of the failure to renew roughly three weeks after January 4, 2022. (*Id.* at ¶ 39).

The failure by Plaintiffs "to automatically renew annual registrations as a result of not having sufficient funds in their FINRA E-Bill accounts is a common occurrence in Tennessee and in other states, and in almost all circumstances, the advisers' registrations are subsequently renewed retroactively by the Division and other state securities regulators without penalty." (*Id.* at ¶ 40). Indeed, Patterson informed Plaintiff Parrott that such an oversight "'happens all the time' and that the registrations would be renewed retroactively." (*Id.* at ¶ 41).

On January 19, 2022, Simon sent to Plaintiff Parrott an email, which was reviewed by Defendant Odom prior to its sending, noting that the "only outstanding items" for Plaintiff Parrott to address with respect "to the applications" for the RIA and IAR registrations "were obtaining any 'missing' agreements; and (2) updating any older (pre-2019) agreements" and that this information should be provided within 30 days of January 19, 2022. (*Id.* at ¶¶ 52, 53, 60). Plaintiff Parrott "was never informed that approval of the registrations was contingent upon him providing the outstanding items." (*Id.* at ¶ 53). However, despite Simon requesting certain missing client agreements or updating older client agreements in the January 19, 2022 email, Defendant Odom "prevented Plaintiffs from contacting their clients to obtain the agreements and informed Mr. Parrott that his clients were 'not his clients anymore.'" (*Id.* at ¶¶ 52, 60).

On January 24, 2022, Plaintiff Parrott submitted materials to renew the at-issue RIA and IAR registrations, and Patterson confirmed that the applications were "'in good order and could

be approved today.'" (*Id.* at ¶ 42). Patterson then approved the application "effective January 24, 2022." (*Id.* at ¶ 43).

However, this was not the end of the process for Plaintiffs, because "[a]ll registration applications [including, inferably, applications for renewal of a registration] initially approved by . . . Patterson are sent to [Defendant] Odom to sign off on the approval." (*Id.* at ¶ 45).

On January 25, 2022, "either [Defendant Odom] or [Defendant Bowling] refused to approve the registrations," and instead Defendant Odom "requested a 'tolling agreement.'" (*Id.* at ¶ 54).[8] Plaintiff Parrott was required by Defendant Odom to "sign the tolling agreement or [else] the applications [for the registration renewals] would be denied." (*Id.* at ¶ 55). Plaintiff Parrott therefore signed the tolling agreement. (*Id.* at ¶ 56). Using such a tolling agreement "to extend the application period for an initial [sic] or renewal of an application's registration" is (allegedly) "an established state procedure," one that Plaintiff alleges resulted in their case in "a *de facto* suspension of Plaintiffs' registrations which infringed on Plaintiffs' right to procedural due process," i.e., "violated Plaintiffs' procedural due process rights," (*id.* at ¶¶ 57, 93, 95), and that resulted in a *de facto* suspension of their registration *renewals*. (*Id.* at ¶¶ 61, 99).[9]

After the tolling agreement was signed by Plaintiff Parrott, "one or both of the Defendants dragged out the . . . registration [process for] nearly five months . . . repeatedly asking Plaintiffs

---

[8] Oddly and regrettably, it is unclear from the Amended Complaint just exactly what the tolling agreement "tolls." As best the Court can discern, the tolling agreement relieved the Division of having to make a decision on Plaintiffs' registration applications within the presumptive deadline for the Division to act on said registration applications. Plaintiffs also allege vaguely that the tolling agreement was somehow used "in an attempt to force Plaintiffs into accepting the alleged [Examination] deficiencies." (Doc. No. 5 at ¶ 87). Plaintiffs imply that as a result of the agreement's prescribed tolling of the decision deadline on their registration applications, Plaintiffs "were unable to conduct advisory business from December 31, 2021 until they were re-registered in March, 2023," thereby resulting in substantial monetary damages, which are detailed further below. (*Id.* at ¶ 70).

[9] That is to say, as explained in further detail below, the tolling agreement effected a denial of Plaintiffs' *applications* for registration renewal.

for additional information (or in some cases, information the Division already had)." (*Id.* at ¶ 58). "Defendant Odom's repeated requests for information after the tolling agreement was signed, together with all of the communications (and omissions from communications) coming out of the Division, falsely led Plaintiffs to believe that their license renewals were not going to be denied." (*Id.* at ¶ 62).

However, "[o]n or about June 16, 2022 . . . the Division filed, and [Defendant] Bowling emailed to counsel for the Plaintiffs, a Notice of Hearing and Charges, requesting the Commissioner of the Tennessee Department of Commerce and Insurance uphold an Order of Denial of the Plaintiffs' applications for renewal of their [RIA and IAR] registrations." (*Id.* at ¶ 63). This occurred despite Plaintiffs being "unaware that [the] Order of Denial had been issued" and being "given no notice or opportunity to be heard as to this Order of Denial." (*Id*).

 Five months later, on November 14, 2022, "a hearing was held before Administrative Judge Elizabeth D. Cambron, sitting on behalf of the Commissioner of the Department of Commerce and Insurance, on the Securities Division's Petition to uphold the Order of Denial." (*Id.* at ¶ 68). Ultimately, on January 27, 2023, Administrative Judge Cambron reversed the Order of Denial. (*Id.* at ¶ 69). Plaintiffs ultimately re-registered as an RIA and IAR, respectively, in March 2023. (*Id.* at ¶ 70).

As a result of the dispute over Plaintiffs' renewal of registration, Plaintiffs "were unable to conduct advisory business from December 31, 2021, until they were re-registered in March 2023," and Plaintiffs lost "approximately $1,700,000.00 in actual revenue," and "an estimated $20 million in assets under management." (*Id.*)

3. Plaintiffs' Claim and Defendants' Motion

Via the Complaint Plaintiffs bring a single claim. ("Plaintiffs' Claim" or "Claim"). Plaintiffs' Claim is a 42 U.S.C. § 1983 claim against Defendants for violation of the right to procedural due process under the Fourteenth Amendment. Via the Claim, Plaintiffs allege they possessed "property interests protected by the Due Process Clause of the U.S. Constitution" both in the RIA and IAR registrations themselves and "in not having the registration[s] revoked or suspended, where a complete application and fee had been filed, all requested information had been provided to the Division . . . and none of the statutory scenarios giving the Commissioner [of the Tennessee Department of Commerce] discretion to deny, suspend, or revoke the registration were present." (*Id.* at ¶ 86).[10] Consistent with the Court's above recounting of Plaintiffs' allegations, Plaintiffs allege that the use of the tolling agreement "was a *de facto* suspension of Plaintiffs' registrations without affording notice or opportunity to be heard," (*id.* at ¶ 87), and that Defendant Odom's actions in "coercing [Plaintiff] Parrott into signing a tolling agreement were illegal and were a violation of Plaintiffs' rights to due process under the Fourteenth Amendment." (*Id.* at ¶ 89). Plaintiffs also allege that the tolling agreement effected a *de facto* denial of their *applications for registration renewal*. (*Id.* at ¶¶ 61, 99).[11] Plaintiffs further allege that there was neither "pre-deprivation process provided for the *de facto* suspension of Plaintiffs' registrations"

---

[10] As noted above, Tenn. Code Ann. § 48-1-112(a) provides certain "statutory scenarios" permitting the Commissioner of the Tennessee Department of Commerce to revoke or suspend a registration or deny an application for a new registration or registration renewal.

[11] Although Plaintiffs frame this in their Amended Complaint as a "*de facto* suspension of Plaintiffs' . . . renewals," (Doc. No. 5 at ¶ 61), the Court understands Plaintiffs to be talking about a *de facto denial* of Plaintiffs' *applications* for registration renewal, because after all, if a registration is not in effect (as is the case here), such registration cannot really be suspended. Accordingly, herein, the Court generally refers to the *de facto* denial as opposed to *de facto* suspension of Plaintiffs' applications for registration renewal.

At times, the Court will refer to a denial of Plaintiffs' *registration renewals*. When it does so, the Court is really referring to the denial of Plaintiffs' *applications* for registration renewal.

that occurred as a result of the tolling agreement, nor a "post-deprivation process, or adequate post-deprivation process," for this *de facto* suspension. (*Id.* at ¶ 92). Plaintiffs also allege that the "administrative proceedings in this case were not sufficiently timely and did not provide any opportunity for Plaintiffs to recover their damages and were therefore inadequate." (*Id.* at ¶ 98). At base then, Plaintiffs' Claim is that the use of the tolling agreement "to extend the application period for an initial [sic] or renewal of an application's registration," (*id.* at ¶ 93), constituted a *de facto* suspension of their "registrations" and a denial of their "registration renewals" (and a deprivation of the purported property interests embodied therein) without adequate process in violation of Plaintiffs' procedural due process rights under the Fourteenth Amendment to the U.S. Constitution. (*Id.* at ¶¶ 87, 99).[12]

Plaintiffs bring their Claim against Defendants in their individual capacities (and not in their official capacities). They seek (1) "Compensatory damages in an amount to be determined at trial;" (2) "Attorneys' fees pursuant to 42 U.S.C. § 1983;" (3) "Court costs;" and (4) "Other damages to be proved at trial." (*Id.* at 17).

Via the Motion, Defendants seek dismissal of Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). (Doc. No. 21 at 1). In particular, Defendants assert that dismissal is proper because (1) Defendants have absolute, quasi-judicial immunity "from acts taken in the process of approval or denial of registration applications";[13] (2) Defendants have qualified immunity that protects them "from liability in

---

[12] As explained further below, what is really at issue here—given that the purported deprivation of a property interest occurred while Plaintiffs were attempting to renew their registrations—is a (purported) deprivation of a property interest associated with the *renewal* of the registrations, as opposed to a deprivation of a property interest in a valid and in-effect registration already attained.

[13] The "defense of absolute immunity" can be "properly raised in a motion to dismiss" pursuant to Fed. R. Civ. P. 12(b)(6). *Henegar v. City of Morristown, Tenn.*, 856 F.2d 194 (Table) (6th Cir. 1988). *See also*

performing their discretionary functions as employees of the [ ] Division";[14] and (3) "Plaintiffs lack a protected property interest necessary to state a claim for violation of the Due Process Clause." (Doc. No. 22 at 5, 8, 11).

<u>LEGAL STANDARD</u>

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy

---

*Bon-Ing, Inc. v. Hodges*, No. 2:16-CV-710, 2016 WL 6680813, at *2 (S.D. Ohio Nov. 14, 2016) ("The defense of absolute immunity presents a legal question which can be raised by a motion to dismiss under Rule 12(b)(6)." (citing *Bright v. Gallia Cnty., Ohio*, 753 F.3d 639, 648 (6th Cir. 2014))), *aff'd,* 700 F. App'x 461 (6th Cir. 2017).

[14] A court considering a motion to dismiss may "dismiss under Fed. R. Civ. P. 12(b)(6) based on qualified immunity." *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005). *See also Duren v. Byrd,* No. 1:18-CV-00084, 2021 WL 3848105, at *9 (M.D. Tenn. Aug. 26, 2021) ("[I]n noting that the defense of qualified immunity is prone to rejection when asserted as a 12(b)(6) or 12(c) motion, the Sixth Circuit makes clear that the defense indeed can be asserted in that manner.").

the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, i.e., allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

Notably, the above principles are most applicable to one kind (the most common kind) of argument made on a Rule 12(b)(6) motion, namely the argument that the plaintiff's allegations are *insufficient* to state a claim. Here, each of Defendants' second and third above-stated arguments is of this type.

But there is a second (and less common) kind of argument that can be made on a Rule 12(b)(6) motion for why the plaintiff's allegations fail to state a claim, namely that they affirmatively show that the defendant(s) necessarily has (have) a legal defense that is fatal to the claim. *See, e.g., Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016) ("Although a motion pursuant to Rule 12(b)(6) [generally] invites an inquiry [only] into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such

as qualified immunity."). For a 12(b)(6) motion to be granted based on this kind of argument, the allegations of the complaint (together with anything else that, as identified above, properly can be considered along with those allegations) must affirmatively show that the defendant necessarily is entitled to the asserted defense as a matter of law. *See, e.g. Bushong v. Delaware City School Dist.*, 851 F. App'x 541, 545 (6th Cir. 2021) ("Because the failure to exhaust is an affirmative defense, dismissal under Rule 12(b)(6) . . . is appropriate only if the face of the complaint shows that the plaintiff has not in fact exhausted her administrative remedies."); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (stating in connection with a limitations defense, that when "the allegations in the complaint affirmatively show that the claim is time-barred," then "dismissing the claim under Rule 12(b)(6) is appropriate."). The first of Defendants' above-stated arguments is of this type.

<u>DISCUSSION</u>

Below, the Court will first address Defendants' argument that the Amended Complaint should be dismissed because Defendants are entitled to qualified immunity. Because the Court ultimately determines that Defendants are entitled to qualified immunity with respect to their actions, the Court does not reach Defendants' other arguments in support of their Motion.[15]

---

[15] Generally, "[i]mmunity is a threshold issue courts must address before considering the merits of a case." *Gratsch v. Hamilton Cnty.*, 12 Fed. App'x 193, 201 (6th Cir. 2001) (noting that the issue of qualified immunity is a threshold issue). *See also Torcasio v. Murray*, 57 F.3d 1340, 1352 (4th Cir.1995) (holding that district courts should consider whether officials are entitled to qualified immunity and then, only if not so entitled, address other issues); *Michaels v. New Jersey*, 50 F. Supp. 2d 353, 361 (D.N.J. 1999) ("Like absolute immunity, qualified immunity is a threshold issue that may be decided by the court at the outset of litigation."). The Court notes that there is some doubt about whether a court *must* address defenses of absolute and qualified immunity before addressing the merits of a claim when evaluating a motion to dismiss raising all such defenses, such as the instant Motion, or whether instead the court has the discretion to decide the order in which to address the raised defenses of absolute immunity, qualified immunity and failure to state a claim (i.e., lack of substantive merit based on the complaint's allegations). *See e.g., Crothers v. Carr*, No. 23-8014, 2025 WL 1122681, at *5 n.6 (10th Cir. April 16, 2025) ("Although absolute immunity and qualified immunity are ordinarily threshold issues that *analytically* precede the merits of a plaintiff's claim, the Supreme Court has noted that neither is jurisdictional. Thus, although it may not

1. Qualified Immunity Generally

As noted above, the defense of qualified immunity properly can be asserted under Fed. R. Civ. P. 12(b)(6). *See, e.g., Peatross*, 818 F.3d at 240. Nevertheless, such dismissal is generally inappropriate, as the Sixth Circuit explained not long ago (in an unpublished opinion, but one relying exclusively on published opinions):

> Although a defendant's "entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (alteration in original) (quotation marks and citations omitted). "The reasoning for our general preference is straightforward: 'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is "obvious" or "squarely governed" by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)). Therefore, it is generally inappropriate for a district court to grant a 12(c) motion based on qualified immunity. *Wesley*, 779 F.3d at 433; *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

*Kilnapp v. City of Cleveland*, No. 22-4059, 2023 WL 4678994, at *3 (6th Cir. July 21, 2023).

However, clarifying its statement that granting a Rule 12 motion based on qualified immunity grounds is "generally inappropriate," the Sixth Circuit has explained that this "general statement is at best imprecise." *Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021). The Sixth

---

always be advisable, it is at least permissible to address the merits of a plaintiff's claim instead of dismissing it based on an immunity defense." (citations omitted) (emphasis added))).

Irrespective of this doubt, the Court here elects to decide first whether Defendants are entitled to immunity (either absolute or qualified) before addressing the merits of Plaintiffs' Claim. Importantly, the Court can identify no case law to suggest that it must determine whether Defendants are entitled to *absolute* immunity *before* determining whether Defendants are entitled to *qualified* immunity. *See e.g., Nader v. Blackwell*, 545 F.3d 459, 478 (6th Cir. 2008) ("Given our holding that [defendant] has qualified immunity from suit, it is unnecessary for us to decide whether he also enjoys absolute immunity."); *Michaels*, 50 F. Supp. 2d at 361 ("Like absolute immunity, qualified immunity is a threshold issue that may be decided by the court at the outset of litigation."). Thus, the Court elects to conduct the qualified immunity analysis first, because it ultimately disposes of Plaintiffs' Claim and therefore moots any issue regarding the applicability of absolute immunity.

Circuit noted that this cautionary proviso is really directed at decisions that rest on "qualified immunity's clearly established prong,"[16] *id.*, but also noted that, "a complaint distinguishable from our past cases on its face will not often survive a motion to dismiss on qualified immunity grounds." *Id.* at 766. This "is especially true where granting relief to the plaintiff can only be done by recognizing a novel constitutional right," and where it is "apparent from the complaint that the law was not clearly established because 'not a single judicial opinion' had held the official's action unconstitutional." *Id.*

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see also Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) ("'[T]he plaintiff bears the burden of showing that an officer is not entitled to the defense of qualified immunity.'" (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016))). To survive the motion to dismiss on qualified-immunity grounds, a plaintiff must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established [by] law at the time, such that a reasonable [official] would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

The analysis of a claim of qualified immunity involves either one or two steps (or "prongs"), each of which involves the court answering a particular question. The "first step is to determine if the facts alleged make out a violation of a constitutional right. The second is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer

---

[16] The court here seemed to be saying that the general rule is primarily a rule that a qualified-immunity defense generally cannot be conclusively established on a 12(b)(6) motion to dismiss specifically on the rationale that the constitutional right allegedly violated was not "clearly established."

would have known that his conduct violated it."[17]*Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Although these two questions may be addressed in either order, both questions must be answered in the affirmative for a plaintiff's claim to proceed. *Id.* (citing *Pearson*, 555 U.S. at 236). So if either question is answered in the negative, the court may dismiss the claim without answering the other question. *Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022) ("If one prong is decisive, we need not to [sic] consider the other.").

Here, as noted above, Defendants have raised the defense of qualified immunity. (Doc. No. 22 at 8-11). Defendants argue that qualified immunity "protects Defendants from liability in performing their discretionary functions as employees of the [ ] Division." (*Id.* at 8). In particular, Defendants assert that Plaintiffs both "cannot establish that they had a property right to a new registration after their prior registration expired" or that "any supposed rights were 'clearly established.'" (*Id.* at 10). The question is thus whether Plaintiffs satisfy their burden to "demonstrate that" Defendants "are not entitled to qualified immunity." *Silberstein*, 440 F.3d at 311.

---

[17] As *Martin*'s verbiage here suggests but does not make entirely clear, the issue here is actually not just whether the right allegedly violated was clearly established. The issue is actually whether it was clearly established that the official's alleged conduct violated a constitutional right. *See, e.g., Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." ) (internal quotation marks omitted); *Beck v. Hamblen Cnty., Tennessee*, 969 F.3d 592, 598 (6th Cir. 2020) ("To overcome a qualified-immunity defense, § 1983 plaintiffs must show two things: that government officials violated a constitutional right and that *the unconstitutionality of their conduct was clearly established* when they acted."). And to answer that question, obviously, it is necessary *but not sufficient* that the right allegedly violated was clearly established.

In sum, the customary framing of the second element is somewhat imprecise because the question ultimately is not just whether *the right allegedly violated was clearly established.* Nevertheless, like other courts, the Court herein at times will use the shorthand reference to the "right" being clearly established without referring explicitly to the requirement that it be clear that the official's conduct violated such right.

2. <u>Whether the Right is Clearly Established</u>

The Court will begin and end its analysis with the question of whether the rights at issue in this case were clearly established "when the event occurred[, meaning] that a reasonable officer would have known that his conduct violated [them]." *Martin*, 712 F.3d at 957. As noted above, a plaintiff has the burden of demonstrating that the right was clearly established at the time of the challenged conduct. *See Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996). The inquiry into whether a right was clearly established must be conducted "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [and] in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Edwards v. Williams*, 170 F. Supp. 2d 727, 735 (E.D. Ky. 2001) (explaining that a plaintiff must show "that any officials in the defendants' positions, measured objectively, would have clearly understood that they were under an affirmative duty to refrain from the conduct."). That is to say, the clearly established right "must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019).

While it is not necessary for a case to be "directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *Pike v. Hester*, 891 F.3d 1131, 1141 (9th Cir. 2018) (explaining that the "clearly established" prong does not require an "exact factual match"). In other words, "[i]n an obvious case, [general] standards can clearly establish the [right], even without a body of relevant case law." *Flying Dog Brewery, LLLP v. Michigan Liquor Control Comm'n*, 597 F. App'x 342, 353 (6th Cir. 2015).

The Sixth Circuit has instructed that "[w]hen determining whether a constitutional right is clearly established, [district courts should] look first to decisions of the Supreme Court, then to [Sixth Circuit] decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012) (citing *Masters v. Crouch*, 872 F.2d 1248, 1251–52 (6th Cir. 1989)). The Sixth Circuit has also advised that if a question is "decided . . . by the highest state court in the state where the case arose," a right may be clearly established. *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988).

Before beginning the analysis of whether the rights at issue in this case were clearly established, however, it is important to explain with specificity what those rights in this particular case would be. *See Emmons*, 58 U.S. at 42. Plaintiffs, as noted above, allege a violation of the right to procedural due process under the Fourteenth Amendment. In effect, Plaintiffs assert that Defendants' use of the tolling agreement constituted a *de facto* suspension of Plaintiffs' registrations and a denial of their registration renewals, thereby depriving Plaintiffs of their property interests without due process.

So, two things must be clearly established for Plaintiffs to overcome the qualified-immunity defense. The first is that Plaintiffs had "property interests . . . in their registrations and in not having a registration revoked or suspended where a complete application and fee had been filed, all requested information had been provided to the Division . . . and none of the statutory scenarios giving the Commissioner [of the Tennessee Department of Commerce] discretion to deny, suspend, or revoke the registration were present." (Doc. No. 5 at ¶ 86).[18] What this really

---

[18] As noted above, Tenn. Code Ann. § 48-1-112(a) sets forth the above referenced "statutory scenarios." The Court understands (in part because Defendants do not argue to the contrary) that the Amended Complaint does not suggest that Plaintiffs' situation involved any of these scenarios, and so (for purposes of the present Motion) the Court does not recognize the existence of any official discretion that may arise specifically in the context of such scenarios.

means—given that here the purported deprivation of a property interest occurred while Plaintiffs were attempting to renew their registrations—is that it must have been clearly established that Plaintiffs had a property interest in the *renewal* of their RIA and IAR registrations, and not just a property interest in a valid and in-effect registration already attained.[19] It is critical to clearly establish that Plaintiffs have such a property interest in their registration renewals because for the purposes of the present action, "[t]o implicate the protections of the due process clause, there must be a deprivation of a property interest." *Wilson Air Center, LLC v. F.A.A.*, 372 F.3d 807, 816 (6th Cir. 2004). In other words, if it was not clearly established that Plaintiffs had a property interest in the renewal of the RIA and IAR registrations then it could not have been clearly established that there was a right to procedural due process in connection with the deprivation of such registration renewals.

Second, it must also be shown that any officials in the "[D]efendants' positions, measured objectively" must have been able to understand that they "were under an affirmative duty to refrain from" using the tolling agreement in order to avoid violating Plaintiffs' due process rights. *Edwards*, 170 F. Supp. 2d at 735. In other words, the Court must determine whether a reasonable official in Defendants' position would have known that using the tolling agreement violated Plaintiffs' due process rights by serving to deprive Plaintiffs of a property interest without (procedural) due process.

Plaintiffs maintained their registrations until December 31, 2021, and the challenged conduct of Defendants in using the tolling agreement (presumably, as noted above, as a means of

---

[19] The Court notes here that although the Amended Complaint at times refers to the "den[ial], suspen[sion], or revo[cation]" of a *registration*, (Doc. No. 5 at ¶ 86) really what is at issue here is the denial of the applications for registration *renewal*. This is something that Plaintiffs make clear through various references to Plaintiffs' registration "renewals" throughout the Amended Complaint. (Doc. No. 5 at ¶¶ 44, 48, 58, 59, 61-67, 69, 99).

relieving the Division of having to make a decision on Plaintiffs' registration applications within the presumptive deadline for the Division to act on said registration applications) did not begin until January 25, 2022, when Defendant Odom requested that Plaintiff Parrott enter into the tolling agreement. (Doc. No. 5 at ¶¶ 54-55).[20] Thus, the Court will limit its review of the case law to cases decided before January 25, 2022.

      a. *Clearly Established Property Interest[21]*

The Court will first begin by examining whether it was clearly established that Plaintiffs had property interests in their registration renewals.

Although the Court was not able to identify a case *directly* addressing whether there is a property interest in the RIA and IAR registrations at issue in this case or, more importantly, a property interest in having those registrations renewed, numerous courts have addressed whether there is a property interest in a business (or business-like) license—which the RIA and IAR registrations appear to resemble based on the Amended Complaint.[22] Numerous courts have also addressed whether there is a property interest in the continued operation of a business, such as the continued operation of EFS that depends upon Plaintiffs' RIA and IAR registrations and their renewals. Indeed, federal precedent also establishes that a property interest can exist even if one is

---

[20] The Court notes for clarity that Defendants' challenged conduct here is *using* the tolling agreement either as a means to postpone a decision on Plaintiffs' applications for registration renewal or, as Plaintiffs allege, "in an attempt to force Plaintiffs into accepting the alleged [Examination] deficiencies," (Doc. No. 5 at ¶ 87), as opposed to merely *requesting* that Plaintiffs enter into the tolling agreement.

[21] The Court is aware that its discussion of whether there was a clearly established property interest in the RIA and IAR registrations may resemble the inquiry into whether the allegations in the Amended Complaint make out a violation of a constitutional right. The Court reiterates for clarity that herein it does not reach the issue of whether Plaintiffs have made out a violation of a constitutional right (the first "prong" of the qualified immunity analysis, i.e., the first requirement for avoiding qualified immunity) and instead addresses only whether any of the constitutional rights at issue herein were clearly established (the second requirement for avoiding qualified immunity).

[22] In other words, to have a RIA or IAR "registration" is akin to having a business "license."

seeking the *renewal* of a registration or license, rather than just seeking to maintain an already existing and in-effect registration or license. The rulings of these courts, as well as general principles underlying when property interests that implicate procedural due process rights are created, certainly suggest that a property interest in the RIA and IAR registrations renewals was clearly established at the time of Defendants' challenged conduct here.

For example, in *Women's Med. Pro. Corp. v. Baird*, the Sixth Circuit noted that "[t]his court has recognized that the Constitution protects a person's choice of careers and occupations," and accordingly found that the plaintiffs had a "protected property interest in the continued operation" of a medical clinic. 438 F.3d 595, 612 (6th Cir. 2006), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.,* 597 U.S. 215 (2022). Other circuits have likewise recognized a property interest in the continued operation of a business—and indeed in this case, possessing the RIA and IAR registrations and actually operating Plaintiffs' business appear to be coterminous in that the Amended Complaint implies that without the registrations, Plaintiffs' business simply cannot operate at all. *See United States v. Tropiano*, 418 F.2d 1069, 1076 (2d Cir. 1969) (recognizing that "[t]he right to pursue a lawful business . . . has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution."); *Small v. United States*, 333 F.2d 702, 704 (3d Cir. 1964) (recognizing "[t]he right to pursue a lawful business or occupation is a right of property which the law protects against intentional and unjustifiable interference.").

Moreover, the Tennessee Supreme Court has recognized that there is a property interest in a business license, such that the business license "may not be revoked without due process of law." *See Estrin v. Moss*, 430 S.W.2d 345, 352 (Tenn. 1968) (noting that "[i]t is true" that a pest control business license constitutes a "property right [that] may not be revoked without due process of

law"). Other federal Courts of Appeals have found likewise. *See e.g., Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (finding that "once the government has granted a business license to an individual, the government cannot deprive the individual of such an interest without appropriate procedural safeguards." (cleaned up)); *Jordan v. United Ins. Co. of America*, 289 F.2d 778, 781 (D.C. Cir. 1961) ("once a going business has been established on the basis of a license or certificate of authority, property rights attach. This means that such license or certificate may not be revoked, nor may renewal be denied, without procedural and substantive due process of law."). *See also Bell v. Burson*, 402 U.S. 535, 539 (1971) ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood . . . . In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.").

Of course, the above analysis does not address the particular issue before the Court—whether there can be a property interest in the requested (potential) *renewal* of a license or registration. However, a further review shows that a property interest in a license exists even if the plaintiff (like Plaintiffs here) is seeking a *renewal* of the license, as opposed to merely seeking to maintain an already valid and in-effect license. *See Easter House v. Felder*, 910 F.2d 1387, 1395 (7th Cir. 1990) (finding that a plaintiff had a property interest in the renewal of a license to operate a child welfare agency); *Richardson v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991) ("a state-issued license for the continued pursuit of the licensee's livelihood, renewable periodically on the payment of a fee and revocable only for cause, creates a property interest in the licensee.").

This case law suggests that it was clearly established that Plaintiffs had property interests in the RIA and IAR registration renewals protected by the due process clause of the Fourteenth Amendment.

Likewise, general judicial principles concerning property interests protected by the due process clause also suggest that it was clearly established that Plaintiff had a property interest in the RIA and IAR registration renewals. *See Flying Dog Brewery*, 597 F. App'x at 353 ("[i]n an obvious case, [general] standards can clearly establish the [right], even without a body of relevant case law."). It is axiomatic that the due process clause protects "those interests to which one has a 'legitimate claim of entitlement,'" *Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)), and a legitimate claim of entitlement includes "any significant property interests, including statutory entitlements." *Brotherton v. Cleveland*, 923 F.2d 477, 480 (6th Cir. 1991) (quotation marks omitted) (citations omitted). Importantly, property interests "are not created by the Fourteenth Amendment, rather they are created and defined by independent sources, such as state law." *Hamilton*, 281 F.3d at 529. It is clear here that Tennessee law has engendered a property interest in the RIA and IAR registration renewals at issue in this case. As detailed in a footnote above, Tenn. Code Ann. § 48-1-112(a) provides that an RIA and IAR registration and registration renewal may be denied, revoked, or suspended only in the event of certain statutorily defined scenarios. This is exactly the kind of registration (or licensing) regime that Tennessee state courts have recognized as providing a constitutionally protectable property interest. *United Pet Supply, Inc. v. City of Chattanooga*, 921 F. Supp. 835, 846 (E.D. Tenn. 2013) ("Under Tennessee law, a professional license that is only revocable upon a showing of cause 'is a constitutionally protectable property interest because the holder of the license has a clear expectation that he or she will be able to continue to hold the license absent proof of culpable conduct.'" (quoting *Martin v. Sizemore*, 78 S.W.3d 249, 263–64 (Tenn. Ct. App. 2001))).[23] Thus,

---

[23] The Court also notes for clarity that although it finds that state officials' discretion was limited with respect to the issuance of RIA and IAR registrations so as to support finding that Plaintiffs possessed a clearly established property interest in such registration renewals, the Court does not mean to imply that

general principles support a finding that Plaintiffs possessed a clearly established property interest in the RIA and IAR registration renewals.[24]

Defendants argue that there can be no property interest in the registrations (and, the Court infers, registration renewals) because "repeated use of the word 'may' [in the statutory scheme] establishes statutory discretion on the part of the Department, the Commissioner, and the Securities Division to deny Plaintiffs' request for registration," and accordingly, "because discretion exists, no property rights exist." (Doc. No. 22 at 16). Defendants assert baldly that even limited discretion is sufficient to show that no property interest exists. (*Id.* at 15). There is no support for this latter assertion in Defendants' briefing, and in any event, Defendants' argument is an oversimplification of Sixth Circuit case law, which provides that "substantive limits on [the] discretion" of state officials may create a property interest. *Experimental Holdings, Inc. v. Farris,* 503 F.3d 514, 520 (6th Cir. 2007). *Cf. Mid-S. Indoor Horse Racing, Inc. v. Tennessee State Racing Comm'n*, 798

---

Defendants' conduct was "ministerial," rather than "discretionary," so as to constitute another basis for depriving Defendants of qualified immunity. An act is ministerial, and thus affords no immunity to the actor, when the act involves "the execution or implementation of a decision and entail[s] only minor decision-making." *Davis v. Holly*, 835 F.2d 1175, 1178 (6th Cir. 1987). Whether a statutory scheme provides a "substantive limit" on officials' discretion so as to suggest the existence of a property interest is an issue distinct from whether an official's act was "ministerial" as to deprive the defendant(s) of qualified immunity. Here, Plaintiffs do not raise the latter issue, and the Court declines to consider it *sua sponte*.

[24] In their Opening Brief, Defendants characterize Plaintiffs' registration applications not as applications for renewal but rather as applications for *new* licenses, (Doc. No. 22 at 12-14), to argue that an application to obtain a new registration "is not a property interest protected by the Due Process Clause." (*Id.* at 14). This argument is unavailing for three reasons. First, the cases Defendants cite in support of this argument (a Connecticut Superior Court case and a Louisiana Court of Appeals case) are not binding on this Court. Second, this argument mischaracterizes the Amended Complaint's allegations, which the Court must accept as true, that characterize the RIA and IAR registration applications as applications for renewal. And third, as discussed further below, the Tennessee statutory scheme underlying the RIA and IAR registrations plainly provides substantive limits on state officials' discretion when revoking or denying RIA or IAR registrations (including denials of indisputably *new* applications), thus engendering a property interest in these registrations not only when an applicant is renewing a pre-existing registration but also when the applicant is seeking a new registration.

So, Defendants are slicing the bologna too thin on the distinction between a renewal of an RIA or IAR registration and an application for a new registration for the purposes of the present action and circumstances.

S.W.2d 531, 540 (Tenn. Ct. App. 1990) ("Where state law gives the licensing agency broad discretion to grant or to deny license applications in a closely regulated activity, the applicants for an initial license do not have a constitutionally protected claim of entitlement." (emphasis added)). Here, the statutory scheme underpinning the granting of RIA and IAR registrations provides exactly those substantive limits on the discretion of state officials (as detailed in the footnote above) to create a property interest; as discussed above, the registrations may be suspended or revoked—and the registration renewals may be denied—only for cause, and otherwise state officials lack discretion when deciding whether to issue or renew a registration.

Defendants cite various other provisions of Tenn. Code Ann. § 48-1-101 — § 48-1-201 to argue that the Commissioner of the Tennessee Department of Commerce has discretion in issuing the registrations at issue so as to prevent the Court from identifying a property interest. Among them are Tenn. Code Ann. § 48-1-110(f)(4), providing certain discretionary measures the Commissioner may take to determine eligibility for registration, Tenn Code Ann. § 48-1-110(f)(5), providing certain provisions related to registrations applied for by issuer-dealers, and Tenn. Code Ann. §§ 48-1-118(e)(1), 48-1-118(g), providing certain discretionary measures the Commissioner may take with respect to investigations and hearings regarding registrations. But these provisions are unavailing to Defendants' argument and inapplicable to the present action because they are concerned mainly with procedures unrelated to this dispute (i.e., those provisions concerning investigations) or are applicable only to issuer-dealers (a category not implicated in Plaintiffs' case (Doc. No. 26 at 18)). Moreover, Defendants' argument ignores the overarching provisions in Tenn. Code Ann. § 48-1-112(a), which (as discussed above) prescribe substantive limitations on the discretion of the Commissioner of the Tennessee Department of Commerce in her ability to deny

an application for a new registration or registration renewal, or revoke or suspend existing registrations.

Accordingly, even though the Court could not identify any cases directly addressing whether there is a property interest in the RIA and IAR registration renewals at issue in this case, it appears clear to the Court that existing precedent placed beyond debate the question of whether Plaintiffs had a property interest in their RIA and IAR registration renewals, *see Mullenix*, 507 U.S. at 12, and that this is "an obvious case" where principles (as discussed above) "clearly establish[ed] the [right], even without a body of relevant case law." *Flying Dog Brewery*, 597 F. App'x at 353. However, this is not the end of the analysis because a property interest within the scope of the Fourteenth Amendment's due process clause is not itself the right at issue. Rather, possessing such a property interest is merely a predicate to the right that *is* at issue in this case: namely the right not to be deprived of the property interest without (procedural) due process of law.

b. *The Tolling Agreement*

Although Plaintiffs' property interest in their RIA and IAR registration renewals is clearly established, the question remains whether "any officials in the [D]efendants' positions, measured objectively" would understand that they "were under an affirmative duty to refrain from" using the tolling agreement in order not to violate Plaintiffs' due process rights. *Edwards*, 170 F. Supp. 2d at 735. That is to say, the question is whether a reasonable official in Defendants' position would have known that using the tolling agreement constituted a deprivation of a protected property interest in the RIA and IAR registration renewals so as to implicate Plaintiffs' due process rights to not have their registration renewals denied without (procedural) due process of law. If the answer is no, then a reasonable official—not knowing that Plaintiffs' due process rights were even

*implicated*—would not (and indeed *could* not) have known further that these rights were not merely *implicated* but actually *violated*.[25]

Plaintiffs point to two cases to argue that Defendants conduct in using a tolling agreement violated a clearly established right. As a reminder, Plaintiffs must establish that the allegations of the Amended Complaint (accepted as true) show that any reasonable official in Defendants' position would have understood that the use of the tolling agreement by Defendants deprived Plaintiffs of their (clearly established) property interest in their registration renewals in violation of Plaintiffs' due process rights to not have their registration renewals denied without due process of law. First, Plaintiffs cite *Johnson v. Morales*, 946 F.3d 911, 922 (6th Cir. 2020) for the proposition that a plaintiff may state "a viable claim that her right to procedural due process was violated by summary suspension of [a] business license." (Doc. No. 26 at 21). But *Johnson* did not address qualified immunity at all,[26] so it teaches nothing about when qualified immunity is or is

---

[25] Moreover, the Court emphasizes that it is not analyzing here whether — *if* the use of the tolling agreement by Defendants constituted a *deprivation* of Plaintiffs' property interests so as to implicate Plaintiffs' due process rights—*such deprivation would have been one without procedural due process of law*. For context, the Court notes that such an analysis would be done under the three-part balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976) to determine what sort of process (i.e., procedures) Plaintiffs should have been afforded prior to the purported *de facto* denials of their registration renewals (i.e., prior to the purported deprivation of their property interests) via the tolling agreement. But here, the Court need not reach the questions of whether any such deprivation would properly be deemed (under *Mathews*) one without due process of law, or of whether a reasonable official in Defendants' position would have known that any such deprivation would have been properly deemed one without due process of law. As to at least the latter question, the Court is highly dubious that the answer would be in the affirmative. But ultimately, the Court need not answer either of these questions, because it finds that a reasonable official in Defendants' position would not have known that their use of the tolling agreement constitutes a deprivation of property within the meaning of the Fourteenth Amendment's Due Process Clause (i.e., for purposes of procedural due process).

[26] *Johnson* was an appeal of a district court's decision to dismiss a complaint. In relevant part, the court in *Johnson* considered claims by a plaintiff that city officials "violated her procedural due process rights by suspending her business license before granting her a chance to be heard." *Johnson*, 946 F.3d at 921. The Sixth Circuit applied the balancing test found in *Mathews v. Eldridge*, 424 U.S. 319 (1976) to determine what sort of process plaintiff should have been afforded before her license was suspended and then concluded that plaintiff had "stated a viable procedural due process claim based on the government's failure

not available to an official who suspended a business license. And it certainly tells us nothing about whether qualified immunity is available in the present case, because it in no way indicates "that any officials in the [D]efendants' positions, measured objectively, would have clearly understood that they were under an affirmative duty to refrain from the[ir] conduct [in using the tolling agreement as a deprivation of Plaintiffs' property interests.]." *Edwards*, 170 F. Supp. 2d at 735.

More specifically, *Johnson* does not avail Plaintiffs in showing that the use of the tolling agreement in this case (which Plaintiffs characterize as a *de facto* denial of Plaintiffs' registration renewals and a deprivation of the property interests thereto without due process of law) was something that "any officials in the [D]efendants' positions, measured objectively" would understand that (by virtue of the Fourteenth Amendment guarantee of procedural due process), they "were under an affirmative duty to refrain from . . . ." *Edwards*, 170 F. Supp. 2d at 735. This is not just because the court in *Johnson*—not being presented with any qualified immunity defense—did not need to and did not address any similar issue (regarding what a reasonable official would have understood). It is also because *Johnson* is factually distinguishable.[27]

---

to provide her some type of hearing before suspending her license." *Johnson*, 946 F.3d at 925. The court's focus was exclusively on whether the plaintiff had stated a valid procedural due process claim, and qualified immunity was not mentioned even once in the opinion.

[27] The Court notes here that Plaintiffs do not appear to challenge directly the "Order of Denial," on "Plaintiffs' applications for renewal of their registration," (Doc. No. 5 at ¶ 63), which may have constituted something akin to a suspension as seen in *Johnson*, or the subsequent proceedings before Administrative Judge Cambron on the Order of Denial. Therefore, the Court does not address herein whether these mechanisms constituted a violation of Plaintiffs' right to procedural due process and whether Defendants would have known these mechanisms would violate said right such that it should be deemed "clearly established."

In the event that Plaintiffs intend to challenge the *adequacy* of the "administrative proceedings" (presumably meaning before Administrative Judge Cambron) as a post-deprivation remedy for the alleged deprivation of their property interest in the registrations, (Doc. No. 5 at ¶ 98), the Court does not reach this issue because it is downstream to whether Plaintiffs possessed a clearly established right not to be subject to a tolling agreement in the first place.

In the present case, Plaintiffs entered into a tolling agreement that Plaintiffs in the Amended Complaint characterize as a mechanism "to extend the application period for an initial [sic] or renewal of an application's registration." (Doc. No. 5 at ¶¶ 93, 95). Plaintiffs characterize the tolling agreement as effecting a *de facto* denial of the registration renewals. (*Id.* at ¶¶ 61, 99). But even assuming that this characterization is fair as far as it goes, and even reading the Amended Complaint in the light most favorable to Plaintiffs as required, it does not appear that such denial is at all similar to the suspension at issue in *Johnson.* Indeed, Plaintiffs themselves characterize the suspension in *Johnson* as a *summary* suspension, (Doc. No. 26 at 21), and the suspension in *Johnson* clearly was an actual and formal suspension. By contrast, in the present case any suspension (or denial) engendered by the tolling agreement was merely "*de facto*" (in the sense that the tolling agreement served to extend the time period for a registration)[28] and involved no summary, actual or formal suspension (i.e., denial of the registration renewals).[29] So whatever *Johnson*—had it actually addressed qualified immunity, and in particular the second prong of qualified immunity—could have conveyed about what reasonable officials would have known about the lawfulness of particular conduct would not have applied to the conduct at issue in the present case.

---

[28] As noted in a footnote above, the exact mechanism by which this tolling agreement functioned is unclear from the Amended Complaint. For the purposes of the instant Motion, it is sufficient to note that Plaintiffs assert that as a result of this extension of the registration period, Plaintiffs "were unable to conduct advisory business from December 31, 2021 until they were re-registered in March, 2023," thereby resulting in substantial monetary damages. (Doc. No. 5 at ¶ 70).

[29] Indeed, the Amended Complaint makes clear that the tolling agreement was offered as an alternative to actual, formal denial of the registration renewals and thus served specifically to prevent an actual or formal denial from occurring. As the Amended Complaint makes clear (and the Court accepts as true for the purposes of the present Motion), Plaintiff Parrott was required by Defendant Odom to "either sign the tolling agreement or the applications [for the registration renewals] would be denied." (Doc. No. 5 at ¶ 55).

For all of these reasons, *Johnson* does not serve to establish that Defendants should have known that their conduct violated Plaintiffs' rights. In fact, the Court cannot infer from the Amended Complaint that a reasonable official in Defendants' position would have understood that the tolling agreement effected a denial of the RIA and IAR registration renewals—which is the alleged deprivation by Defendants of Plaintiffs' property interests allegedly without due process of law—so as to implicate due process protections in the first place.

Plaintiffs next point the Court to *Amato v. Office of Louisiana Com'r of Securities*, 644 So.2d 412, 417 (La. App. 4th Cir. 1994). However, the Court need not consider this case in determining whether Defendants should have known that their conduct violated Plaintiffs' due process rights not to have their registration renewals denied without due process of law. Although Plaintiffs characterize *Amato* as a decision from the "Fourth Circuit," (Doc. No. 26 at 21), in a seeming reference to the U.S. Court of Appeals for the Fourth Circuit, *Amato* is actually a decision from the Fourth Circuit, Court of Appeals of *Louisiana*. The decision of an intermediate *state court* from *outside* of Tennessee, cannot possibly function to clearly establish law with respect to the lawfulness of the conduct in this case of Defendants (who are Tennessee state officials). *See e.g.,* *Andrews*, 700 F.3d at 853 ("When determining whether a constitutional right is clearly established, [district courts should] look first to decisions of the Supreme Court, then to [Sixth Circuit] decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal."); *Robinson*, 840 F.2d at 351 (if a question is "decided . . . by the highest state court in the state where the case arose."). Accordingly, the Court herein will not consider the substance of the *Amato* decision, because irrespective of what *Amato* says, it cannot be used to show that law was clearly established in this particular case and as to these particular Defendants.

Even though Plaintiffs do not cite any additional case law to show that reasonable officials in Defendants' position would have known that the use of the tolling agreement violated Plaintiffs' due process rights in not having their registration renewals denied without due process of law, the Court has nevertheless further canvassed relevant case law on this point.

In this review, the Court was able to identify cases establishing that the suspension of a license to operate a business or engage in an occupation without adequate process can violate a right to procedural due process. *See e.g., Guillemard-Ginorio v. Contreras-Gomez*, 490 F.3d 31, 37-41 (1st Cir. 2007) (denying qualified immunity where officials suspended insurance licenses for five-years in violation of procedural due process rights); *Tollett v. Laman*, 497 F.2d 1231, 1234 (8th Cir. 1974) (finding plaintiff established that a trailer park license "was revoked without notice and in violation of his rights to procedural due process."). *Cf. George-Khouri Family Ltd. P'ship v. Ohio Dept. of Liquor Control*, No. 04-3782, 2005 WL 1285677, at *5 (6th Cir. May 26, 2005) ("the state must accord a liquor licensee due process before revoking the license."). However, these cases, and their principles, do not avail Plaintiffs for much the same reasons as *Johnson*. The Court does *not* deny that if Defendants had *formally* denied Plaintiffs' registration renewals via the tolling agreement, such denial potentially *could* (though not necessarily *would*) have constituted a violation of a clearly established right; that is, such a formal denial would strike any reasonable official as a clear deprivation of Plaintiffs' property interest (in the registration renewals), so that the denial would constitute a violation of a clearly established right to avoid such a deprivation without due process of law *if* (albeit only if) a reasonable official in Defendants' position would have known that such a deprivation is properly deemed one without due process of law under the

*Mathews* test.[30] But again, that is not what has happened here. Rather, Plaintiffs entered into a tolling agreement that Plaintiffs characterize as a *de facto* denial of their registration renewals. However, even reading the Amended Complaint in the light most favorable to Plaintiffs, it does not appear that the tolling agreement at issue in this case is at all similar to a formal suspension of a license to operate a business. Indeed, as noted above, the Amended Complaint makes clear (and the Court accepts as true for the purposes of the present Motion), that Plaintiff Parrott was required by Defendant Odom to "either sign the tolling agreement or the applications [for the registration renewals] would be denied," (Doc. No. 5 at ¶ 55), thereby showing a clear distinction between a formal suspension or denial (like those in the cases reviewed by the Court) of the RIA and IAR registration renewals and the tolling agreement mechanism used by Defendants at issue in this case. Thus, the Court cannot conclude based on this case law that "any officials in the [D]efendants' positions, measured objectively," *Edwards*, 170 F. Supp. 2d at 735, would have understood they were under a duty to refrain from using a tolling agreement (lest they violate Plaintiffs' due process rights by *both* depriving Plaintiffs of their property interest in the registration renewals *and* doing so without due process of law as measured by *Mathews*). That is, the Court cannot conclude based on the Amended Complaint that any reasonable official in Defendants' position would have understood that the tolling agreement in substance constituted a denial of the RIA and IAR registration renewals so as to amount to a "deprivation" as to implicate due process protections, let alone a deprivation that flunked the *Mathews* test.

 Faced with this dearth of supporting case law, Plaintiffs also argue abstractly that "[i]t has been the law of the land for decades that procedural due process requires, at a bare minimum,

---

[30] The Court reiterates here that Plaintiffs do not challenge the "Order of Denial," which actually does appear to resemble the more formal suspension or revocation process detailed in the cases reviewed by the Court.

notice and an opportunity to be heard," (Doc. No. 26 at 20), and that "with a couple of inapplicable exceptions, '[i]t is the general rule that due process 'requires some kind of a hearing before the State deprives a person of liberty or property.'" (*Id.*) (citing *Johnson*, 946 F.3d at 921). Yet this will not do. Federal precedent plainly provides that this Court "should not define clearly established law at a high level of generality." *Mitchell v. Schlabach*, 864 F.3d 416, 424 (6th Cir. 2017). Moreover, Plaintiffs' general statements are incomplete as stated in ways that mirror the incompleteness of his showing to overcome qualified immunity. It is not necessarily true that procedural due process requires notice and an opportunity to be heard; what is true is that procedural due process requires notice and an opportunity to be heard prior to the *deprivation* of a property interest, and Plaintiff has failed to establish that a reasonable official would have known that what Defendants did constitutes a deprivation. And as to what process is required before such a deprivation, even if it is *generally* true that a hearing is required, that does not mean that one is always required or that one was required before deprivation in this particular case; still less does it mean that that a reasonable official would have known that a hearing was required in this case.

Finally, Plaintiffs argue that the "Amended Complaint alleges that the Defendants were fully aware that their actions were illegal and repeatedly attempted to cover it up by falsely stating, under oath, the Plaintiffs applications were incomplete" and that the Amended Complaint alleges that "Defendants knew the applications were complete, but forced Mr. Parrott into signing a tolling agreement in an attempt to maximize fines and penalties for alleged exam deficiencies, then giving Plaintiffs a false representation and/or concealing material facts—leading them to falsely believe that the Division and Defendant Odom were working with Plaintiffs in good faith to achieve renewal." (Doc. No. 26 at 24) (citing Doc. No. 5 at ¶¶ 44, 47-66, 87-89). Plaintiffs refer to these allegations in the Amended Complaint in a seeming attempt to show that qualified immunity

should not apply to Defendants' conduct because "the definition of 'clearly established' 'functions to protect all but the plainly incompetent or those who knowingly violate the law.'" (Doc. No. 26 at 24) (quoting *Mitchell*, 864 F.3d at 424). Yet Plaintiffs' argument skirts around the actual inquiry underlying the clearly established prong of the qualified immunity analysis: the Court must determine whether "existing precedent . . . placed the statutory or constitutional question beyond debate," *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. 731, 741 (2011)), *thereby* protecting "all but the plainly incompetent or those who knowingly violate the law." *Id.* In other words, for an official to knowingly (or by plain incompetence) violate the law, existing precedent must have placed the statutory or constitutional question beyond debate; if existing precedent does not do so, then the official cannot validly be accused of violating the law knowingly or by plain incompetence. It is not enough for a complaint to allege in conclusory fashion that certain defendants *knowingly* violated the law; rather, a court must engage in the inquiry (which the Court herein has done) to determine whether the right at issue in this particular case is clearly established, and as detailed at length above, officials in Defendants' position "measured objectively" would not have been able to understand that they "were under an affirmative duty to refrain from" using the tolling agreement in order to avoid violating Plaintiffs' due process rights to not have their registration renewals denied without due process of law. *Edwards*, 170 F. Supp. 2d at 735.

The Court also notes that in its analysis above, the Court assumed that the use of the tolling agreement amounts to the conduct of *Defendants*, rather than conduct jointly agreed to by the parties and that is no more attributable to Defendants than to Plaintiffs. However, this assumption is actually not well-taken, because Plaintiff has failed to establish even that a reasonable official in Defendants' position would have understood that implementation of an agreement between the Division and Plaintiff Parrott counts as conduct amounting to state action, a required element of a

procedural due process claim. *See Novak v. Federspiel*, 140 F.4th 815, 820 (6th Cir. 2025) ("A procedural-due-process claim requires proof of the following two elements: '(i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process.'" (quoting *Reed v. Goertz*, 598 U.S. 230, 236 (2023))). That is, Plaintiff has failed to explain why such an official would have understood that merely by using (relying on) on the terms of the tolling agreement—to which Plaintiff Parrott *mutually agreed* despite being presented with an alternative to entering into it—the official was not simply allowing the agreement to operate just as it was mutually agreed but rather was affirmatively engaging in state action. This alone could also justify the dismissal of the Amended Complaint.

In sum, the Amended Complaint is "distinguishable from [ ] past cases on its face." *Crawford v. Tilley*, 15 F.4th at 766. It is exactly complaints such as these that the Sixth Circuit has noted "will not often survive a motion to dismiss on qualified immunity grounds." *Id.* Therefore, Defendants are entitled to qualified immunity for their actions in imposing the tolling agreement and the Amended Complaint will be dismissed in an accompanying order granting the Motion (Doc. No. 21).

<u>CONCLUSION</u>

Accordingly, for the reasons described herein, the Motion (Doc. No. 21) will be **GRANTED**, and the Amended Complaint will be dismissed.

An appropriate accompanying order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE